**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| DOROTHY LLOYD, | |
| Plaintiff, | |
| | Civil Action No.: |
| v. | |
| TWIN CEDARS YOUTH AND FAMILY SERVICES, INC., | |
| Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW, Plaintiff Dorothy Lloyd, and brings this action pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, as amended, the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* Plaintiff alleges that Defendant Twin Cedars Youth and Family Services, Inc. subjected Plaintiff to discrimination based on race and disability, including through its failure to provide a reasonable accommodation, and that Defendant failed to compensate Plaintiff for all hours worked at the rate of at least minimum wage and failed to compensate Plaintiff at the appropriate rate of overtime, and that Defendant further interfered with Plaintiff's right to leave under the Family and Medical Leave Act, respectfully showing the Court as follows:

### JURISDICTION AND VENUE

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331 & 1343 and the enforcement provisions of the Americans with Disabilities Act,

Title VII of the Civil Rights Act, the Fair Labor Standards Act, and the Family and Medical Leave Act.

2.

Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Plaintiff was employed, and the events underlying this action occurred, in Macon, Bibb County, Georgia, which is located within this judicial district.

**PARTIES**

3.

Plaintiff Dorothy Lloyd (hereinafter, "Plaintiff" or "Lloyd") is a citizen of the United States and a resident of Georgia. At all times relevant to this suit, Ms. Lloyd was employed with Defendant Twin Cedars Youth and Family Services, Inc.

4.

At all relevant times, Ms. Lloyd was considered a covered, non-exempt employee under all laws referenced herein.

5.

Defendant Twin Cedars Youth and Family Services, Inc. (hereinafter, "Defendant") is a domestic nonprofit corporation, incorporated under the laws of the State of Georgia. Defendant's principal office is located at 701 Lincoln Street, LaGrange, Troup County, Georgia 30241. Defendant may be served with process through its Registered Agent, J. David Overby, located at 1022 East Depot Street, LaGrange, Troup County, Georgia 30241.

6.

Defendant has employed in excess of 50 employees, working for at least 20 calendar weeks, in 2021 and preceding years.  Defendant does business in excess of $500,000.00 on an annual basis, and Defendant's employees' work regularly involves them in interstate commerce.

7.

Defendant is a covered employer within the meaning of the Americans with Disabilities Act and Title VII of the Civil Rights Act.

8.

Defendant is also a covered employer under the Rehabilitation Act because Defendant receives federal grants of assistance and otherwise has contracts with the federal government, including loans from the Small Business Administration and the Paycheck Protection Program and grants issued by the United States Department of Justice.

9.

Defendant is a covered enterprise under the Fair Labor Standards Act.

10.

At all relevant times to this action, Plaintiff had worked for Defendant for at least twelve months, she worked for at least 1,250 hours during the twelve months preceding her leave, and she worked at a location where Defendant had at least 50 employees within a 75-mile area.  As a result, Defendant is a covered employer under the Family and Medical Leave Act, and Plaintiff was an eligible employee under the same.

## STATEMENT OF FACTS

### 11.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 10, as if the same were set forth herein.

### 12.

Ms. Lloyd was employed with Defendant on two separate occasions, and most recently beginning on November 20, 2017 as a File Clerk, and then as an Administrative Coordinator in January 2018, at Defendant's Georgia Industrial Children's Home located at 4690 North Mumford Road, Macon, Bibb County, Georgia 31210.

### 13.

Ms. Lloyd's first period of employment ended when she submitted her resignation after Defendant issued an adverse action against her during, and as a result of, Ms. Lloyd having to go out on leave for surgery.

### 14.

In 2017, Ms. Lloyd actually applied for the position of Group Leader; however, after an interview, Defendant's Assistant Director, Janet Lawson, expressed her concern about Ms. Lloyd serving in this role because of Ms. Lloyd's family responsibilities in caring for her mother.

### 15.

Instead, Defendant hired Ms. Lloyd as a File Clerk, particularly because Ms. Lloyd's already had knowledge of Defendant's organization and operations.

### 16.

Since Ms. Lloyd would have to take her mother to medical appointments from time-to-time, Defendant expressed that it would be flexible with regard to Ms. Lloyd's schedule.

17.

Ms. Lloyd suffers from chronic arthritis, spinal disc herniation or bulging discs in her neck, and lumbar spinal stenosis.

18.

Arthritis is the swelling and tenderness of joints which causes joint pain and stiffness throughout Ms. Lloyd's body.

19.

Spinal disc herniation is the result of an injury to the cushioning and connective tissue between Ms. Lloyd's vertebrae that results in severe neck pain, numbness, tingling, paresthesia, and changes in motor function such as weakness, paralysis, and affection of reflexes.

20.

Spinal stenosis is an abnormal narrowing of the spinal canal that results in pressure on spinal cord and causes pain, numbness, and weakness in Ms. Lloyd's arms or legs.

21.

These conditions, alone and in the aggregate, are physical impairments that substantially limit Ms. Lloyd's major life activities such as performing manual tasks, sleeping, walking, standing, lifting, bending, and working.

22.

Still, despite these conditions and their associated symptoms, Ms. Lloyd was able to perform the essential functions of the positions she held at all times.

23.

Moreover, Defendant was aware of the aforementioned conditions, in part, because Ms. Lloyd had to take leave to have surgery on her neck during her first period of employment, as well as the fact that Ms. Lloyd would keep Defendant apprised as to all of her medical appointments.

24.

Defendant ultimately made Ms. Lloyd the Administrative Coordinator. In this role, Ms. Lloyd was tasked with supporting Defendant's Executive Director, and she worked directly with the Human Resources Coordinator.

25.

As Administrative Coordinator, Ms. Lloyd was also required to operate the telephone switchboard, manage Defendant's Administrative Office, process incoming and outgoing mail, account for petty cash and accounts receivable, process employment applications and onboarding information, and issue purchase orders for goods and supplies and sometimes acquire such supplies herself.

26.

Critically, there was nothing listed in Ms. Lloyd's job description, nor the actual demands of her job, that required Ms. Lloyd to exert herself physically. Moreover, Ms. Lloyd was not required to move heavy objects, and the heaviest things that she would have to lift at work were a few reams of copy paper on occasion.

27.

At all relevant times, Ms. Lloyd's performance was exemplary to the extent that, in February 2020, Defendant issued a written commendation to Ms. Lloyd concerning her performance, referring Ms. Lloyd as a "role model" and expanding her job duties as a result.

28.

As the result of such performance, when certain positions became vacant, such as human resources coordinator and maintenance, Ms. Lloyd was often asked to perform the functions for the vacant positions in addition to her own.  Still, Ms. Lloyd's performance remained exemplary.

29.

From November 2017 until her termination, Ms. Lloyd was often asked to do work, including shopping for supplies after-hours, or to perform work over the weekend.

30.

While Defendant used a time clock to track employees' time and attendance records, any work that Ms.  Lloyd performed after hours was not similarly logged.

31.

Defendant was aware that Ms. Lloyd was being asked to perform work when she was not on the clock, including time that Ms. Lloyd was required to spend shopping for office supplies or depositing checks into Defendant's bank account.

32.

However, Defendant failed to compensate Ms. Lloyd for any of her time working after normal work hours.

33.

Similarly, from November 2017 until her termination, Ms. Lloyd frequently had to work in excess of 40 hours per workweek.

34.

While Ms. Lloyd was compensated when she worked over forty hours in a given workweek, Defendant frequently failed to pay Ms. Lloyd at a rate of time and a half.  Moreover,

Ms. Lloyd did not receive compensation at the overtime rate for those times when she had to perform work while she was off of the clock.

35.

Around Summer 2020, Ms. Lloyd met with a specialist and explained to the doctor that she was experiencing immense pain when she turned her neck. Even more concerningly, when Ms. Lloyd would turn her neck, the movement would sometimes cause her to be unable to see.

36.

As a result, Ms. Lloyd and the physician decided that it was time for her to have surgery to address the aforementioned conditions in both her neck and back.

37.

Several of Defendant's employees, including Assistant Director Janet Lawson, had recently expressed concerned about Ms. Lloyd and her condition.  Specifically, when Ms. Lloyd told Assistant Director Lawson that she had seen a neurosurgeon, Lawson responded, "that doesn't sound good," and Assistant Director Lawson expressed additional concern when she found out that Ms. Lloyd would need to have surgery on both her neck and back.

38.

While the doctor wanted Ms. Lloyd to have surgery on both her neck and back, he believed that the problems in Ms. Lloyd's neck needed to be addressed first.  As a result, Ms. Lloyd scheduled and had surgery to her neck on September 2, 2020.

39.

After the surgery, Ms. Lloyd's doctor told her that she could still drive, but the physician advised Ms. Lloyd that she should avoid lifting objects during her recovery.

40.

Ms. Lloyd remained out of work during her recovery, and Defendant approved her leave.

41.

However, by October 2020, Ms. Lloyd continued to have swelling in her neck and throat, and after performing an x-ray, her doctor decided that Ms. Lloyd would need to come back for a follow up and second surgery approximately two weeks later.

42.

When Ms. Lloyd later returned to the doctor in November 2020, the physician found that Ms. Lloyd's neck had improved from the surgery, and as a result, she should also have surgery on her back soon thereafter.

43.

Defendant initially granted Ms. Lloyd's request for leave pursuant to the Family and Medical Leave Act (hereinafter, "FMLA") in or around September 2020.

44.

However, during the period on which Ms. Lloyd was on leave, there were several occasions when Ms. Lloyd's supervisors contacted her to ask her to perform various tasks.

45.

Specifically, Ms. Lloyd's supervisors asked her work-related questions on numerous occasions, and Ms. Lloyd was required to shop and pick up office supplies for Defendant.

46.

One time during her leave, Ms. Lloyd's supervisor also asked her to return to work to help to ensure that financial records for Defendant's residents had been updated.

47.

On October 14, 2020, while she was still on leave, Ms. Lloyd was asked to come to the office to handle Defendant's petty cash, she cashed Defendant's residents' allowance checks and made sure that residents' accounts were up to date.  When Ms. Lloyd went into the office on October 14, 2020, she prepared a letter requesting other employees to donate paid leave to Ms. Lloyd.

48.

On several other days during her leave, Ms. Lloyd was required to go to the bank to cash checks for Defendant, and Ms. Lloyd was asked to prepare and compile new hire packages for Defendant's new employees.

49.

Ms. Lloyd was also asked to prepare reports while she was on leave, including a census report of Defendant's residents that she prepared and submitted on November 23, 2020.

50.

In all, Ms. Lloyd was asked or otherwise required to work for, at least, the equivalent of one week of full-time work.

51.

As discussed herein, Ms. Lloyd prepared a request for other employees to donate paid leave to her on October 14, 2020.  However, Ms. Lloyd later found that Defendant not only failed to post her request, there were several other employees who attempted donate their paid leave to Ms. Lloyd, but Defendant refused to process the request.  As a result, Ms. Lloyd ran out of accrued paid leave during her FMLA leave, and she stopped receiving compensation.

52.

Defendant apparently considered November 25, 2020 as the day in which Ms. Lloyd's FMLA leave would be exhausted.  However, Defendant failed to advise Ms. Lloyd of this date until on or about December 2, 2020.

53.

When Ms. Lloyd had seen her doctor for a post-surgery appointment on October 6, 2020, the medical provider found that Ms. Lloyd was still experiencing swelling in her neck, and he decided to keep Ms. Lloyd out of work until her follow up appointment that was scheduled for November 19, 2020.

54.

During the November 19, 2020 appointment, the doctor felt like Ms. Lloyd was ready to have the back surgery, and the doctor advised Ms. Lloyd to remain out of work until that time. Ms. Lloyd's surgery was scheduled during this appointment.

55.

Immediately after the November 19, 2020 appointment, Ms. Lloyd attempted to contact Assistant Director Lawson by telephone, but was unable to reach her.  Since Assistant Director Lawson did not have an email address for work, Ms. Lloyd sent a text message to the Assistant Director with her doctor's excuse.

56.

Assistant Director Lawson called Ms. Lloyd soon thereafter and acknowledged that she had missed Ms. Lloyd's call.  During this call, Ms. Lloyd explained that she was still experiencing swelling in her neck.  Assistant Director Lawson responded by trying to convince Ms. Lloyd that

she had too much going on in her life based on the care she was providing for her mother alongside of her work responsibilities.

57.

On December 2, 2020, Ms. Lloyd received a call from Defendant's HR Director Neal Phillips.

58.

During this call, HR Director Phillips criticized Ms. Lloyd for failing to communicate about her return while she had been out on leave.  In response, Ms. Lloyd explained that she had indeed been communicating with her supervisors and HR after each and every doctor's appointment that she had.

59.

During the same call, HR Director Phillips told Ms. Lloyd that he would have to follow up with Ms. Lloyd to see whether Defendant would need to find someone to replace Ms. Lloyd because of her absence.

60.

Previously, Defendant terminated another employee for taking FMLA leave for the purposes of having hip surgery.  However, the reasons that Defendant provided for terminating this other employee were false.

61.

After her call with HR Director Phillips, Ms. Lloyd called her doctor immediately to explain what she had been told about her employment.

62.

While the doctor felt like Ms. Lloyd needed to remain out of work until her upcoming

surgery, upon hearing that Ms. Lloyd's employment with Defendant was at risk if she did not

return, the doctor cleared Ms. Lloyd to return to work on Tuesday, December 8, 2020, so long as

she avoided pushing, pulling, or lifting items over ten (10) pounds until she was able to undergo

back surgery.

63.

Ms. Lloyd did not anticipate the doctor's restrictions being a problem, particularly given

that her job had never required her to lift heavy objects.

64.

Ms. Lloyd immediately provided her doctor's note to her supervisors on the afternoon of

December 2, 2020, and she prepared to return to work the following week.

65.

On Thursday, December 3, 2020, Ms. Lloyd also had her daughter, who happened to be

one of Ms. Lloyd's coworkers, drop off a hard copy of Ms. Lloyd's doctor's note with Defendant's

HR representatives.

66.

However, Ms. Lloyd did not receive any response from Defendant.  As a result, Ms. Lloyd

reached out to Defendant's HR representatives at its LaGrange location, and she once again

provided copies of the documentation she received from her doctor.

67.

By Friday, December 4, 2020, HR Director Phillips had not followed up with Ms. Lloyd,

as he had previously indicated, to discuss her return to work or whether Defendant would need to

fill Ms. Lloyd position.

68.

By Friday, December 4, 2020, no one associated with Defendant had contacted Ms. Lloyd to discuss her return to work or her doctor's most-recent restrictions.

69.

Moreover, by December 4, 2020, none of Defendant's employees attempted to analyze the essential functions of Ms. Lloyd's job, ascertain how Ms. Lloyd's limitations could be overcome with reasonable accommodations, nor identify any other potential accommodations.

70.

On Saturday, December 5, 2020, Ms. Lloyd received a delivery from Defendant via FedEx.

71.

The package contained correspondence dated December 4, 2020, confirming Defendant's receipt of Ms. Lloyd's December 2nd doctor's note, and explicitly stating that Defendant could not find a job that met Ms. Lloyd's medical restrictions.

72.

As a result, the letter said that Ms. Lloyd was being terminated, and a Georgia Department of Labor Separation Notice was enclosed.  The Separation Notice also said that Ms. Lloyd was being terminated because Defendant was unable to accommodate her work limitations.

73.

As reflected by Defendant's notices, Defendant decided to terminate Ms. Lloyd's employment as a result of her requested accommodation, and not because Defendant believed that that Ms. Lloyd had exhausted her FMLA leave.

74.

Because of her termination, Ms. Lloyd lost her employer-provided health insurance.  As a

result, she is unable to afford the surgery that she needs for her back.  Similarly, Ms. Lloyd is unable to satisfy outstanding out-of-pocket expenses arising from her earlier next surgery.

75.

Because Ms. Lloyd was unable to afford surgery without the health insurance she previously had, the condition of Ms. Lloyd's back has continued to become worse to the extent that Ms. Lloyd now experiences even greater pain, and she is often physically unable to get out of bed and she also has trouble going to sleep and staying asleep.

76.

Upon information and belief, Defendant decided to terminate Ms. Lloyd's employment because Defendant knew that Ms. Lloyd required additional surgery to her back, and as a result, would require additional leave.

77.

Alternatively, Defendant decided to terminate Ms. Lloyd's employment because Defendant sought to avoid any costs or increases in premiums associated with Ms. Lloyds employer-provided health insurance that Defendant would incur as a result of the back surgery that Ms. Lloyd soon required.

78.

Alternatively, Defendant decided to terminate Ms. Lloyd's employment because Defendant did not want to provide any accommodations to Ms. Lloyd for her medical condition.

79.

Moreover, Defendant treated Ms. Lloyd, who is a black female, less favorably than her non-black coworkers.

80.

Even though Defendant did not claim that Ms. Lloyd was terminated as a result of her performance or conduct, Ms. Lloyd is aware of numerous occasions in which Defendant refused to terminate, or even discipline, its white employees who had been shown to have engaged in misconduct or gross negligence in the performance of their duties.

81.

One such instance was when one of Defendant's white employees failed to maintain control of her keys to the facility, causing one of Defendant's minor residents to use the key to gain access to one of Defendant's vehicles, resulting in a high-speed chase with law enforcement.  The employee at issue was not terminated, and management only reluctantly issued the employee a written warning.

82.

Similarly, there have been occasions in which Defendant has posted job openings, but after interviewing applicants and discovering they were persons of color (i.e., non-white), Defendant decided not to fill such positions at that time.  On these occasions, Defendant later filled the same positions soon thereafter with applicants who were white.

83.

On December 4, 2020, the day that Defendant fired Ms. Lloyd, there were reasonable accommodations available that would have allowed Ms. Lloyd to perform the essential functions of her position, and that would not have otherwise caused Defendant to sustain any undue hardship.

84.

However, in refusing to provide Ms. Lloyd a reasonable accommodation, Defendant failed to consider whether the restrictions required by Ms. Lloyd's physician would have actually caused

Defendant any undue hardship.

85.

On December 4, 2020, the day that Defendant fired Ms. Lloyd, she was qualified and able to perform the essential functions of her position.

86.

Additionally, on December 4, 2020, the day that Defendant fired Ms. Lloyd, there were also vacant positions for which Ms. Lloyd was qualified, including Administrative Coordinator at Defendant's Anne Elizabeth Shepard Home, Group Leader at Defendant's Bradfield Center, as well as several Group Leader Positions and Shift Leader Positions at Defendant's Georgia Industrial Home, the location in which Ms. Lloyd was assigned.

87.

Defendant failed to consider allowing Ms. Lloyd to remain in her position, or to transfer Ms. Lloyd to any of the aforementioned, vacant positions.

Procedural/Administrative Background

88.

On or about June 2, 2021, Ms. Lloyd submitted her Charge of Discrimination to the Equal Employment Opportunity Commission (hereinafter, "EEOC"), alleging that she had been subjected to discrimination based on race and disability. The EEOC assigned Ms. Lloyd Charge Number 410-2021-05050.

89.

Defendant had actual notice of the EEOC Charge, participated in the administrative proceedings, and was represented by counsel at that time.

90.

The EEOC subsequently issued a Notice of Right to Sue, which was dated February 25, 2022, which Ms. Lloyd received through counsel on March 1, 2022.

91.

Ms. Lloyd has exhausted her administrative remedies as to her Charge of Discrimination and she is filing the instant action within ninety days of the EEOC's issuance, as well as Ms. Lloyd's receipt, of the Notice of Right to Sue.

**COUNT I:**
**DISCRIMINATION IN VIOLATION OF**
**THE AMERICANS WITH DISABILITIES ACT**

92.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 91, as if the same were set forth herein.

93.

The Americans with Disabilities Act prohibits covered entities from "discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

94.

As alleged herein, Defendant and Plaintiff are a covered, nonexempt employer and non-exempt employee under the ADA, respectively. See 42 U.S.C. § 12111.

95.

As alleged herein, Plaintiff had been employed with Defendant on multiple occasions and she had been serving as Defendant's Administrative Coordinator for nearly three years at the time

of her termination.  Plaintiff had been performing her duties in that role, and was otherwise qualified and able to perform the essential functions of her job, with or without a reasonable accommodation. Moreover, the evidence will reflect that Plaintiff's performance was not only satisfactory, but exemplary.

96.

As alleged herein, Plaintiff has a disability, a history of a disability, and was perceived by Defendant as having a disability, that substantially limits a number of major life activities.

97.

Specifically, Plaintiff suffers from chronic arthritis, spinal disc herniation or bulging discs in her neck, and lumbar spinal stenosis.  All of these conditions, individually and in the aggregate, substantially limit several major life activities for Plaintiff such as performing manual tasks, sleeping, walking, standing, lifting, bending, and working.

98.

When Plaintiff later requested that Defendant provide a reasonable accommodation in the form of the restrictions recommended by her doctor, said restrictions were based on Plaintiff's medical condition, and not necessary because of any surgery or procedure that Plaintiff had undergone.

99.

Defendant was aware of Plaintiff's disabilities.

100.

As alleged herein, Defendant terminated Plaintiff's employment because of Plaintiff's disability.

101.

Alternatively, as alleged herein, Defendant terminated Plaintiff's because of leave that Defendant believed that Plaintiff would need in the future in order to have surgery to address her disabilities.

102.

Alternatively, as alleged herein, Defendant terminated Plaintiff's because of the additional costs that Defendant anticipated it would incur as a result of the medical procedures that Plaintiff needed to address her disabilities and the resulting increase in costs to Defendant with regard to its employer-provided health insurance plan.

103.

Alternatively, as alleged herein, Defendant terminated Plaintiff's because Defendant did not want to provide a reasonable accommodation for Plaintiff's disabilities.

104.

Plaintiff has been injured by Defendant's discrimination based on disability, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including back pay, reinstatement or front pay, compensatory punitive damages of not less than $300,000.00, or such other amount permitted by statute, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT II:**
**DISCRIMINATION**
**IN VIOLATION OF THE REHABILITATION ACT**

105.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 91, as if the same were set forth herein.

106.

The Rehabilitation Act of 1973 prohibits discrimination based on disability in "any program or activity receiving Federal financial assistance or under any program or activity conducted by an Executive agency…" 29 U.S.C. § 794(a).

107.

Defendant, as a program receiving Federal financial assistance and grants, both directly and indirectly, from the United States government, and Plaintiff, as an employee of Defendant, are a covered entity and individual, respectively, under the Rehabilitation Act.

108.

The Rehabilitation Act expressly incorporates the standards used in Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111, *et seq.* 29 U.S.C. § 794(d).

109.

For the reasons set forth in Count I, *supra*, Defendant discriminated against Plaintiff based on disability.

110.

Plaintiff has been injured by Defendant's discrimination due to disability, and Plaintiff is entitled to all damages available under the Rehabilitation Act, in an amount to be proven at trial.

**COUNT III:**
**FAILURE TO PROVIDE REASONABLE ACCOMMODATION**
**IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

111.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 91, as if the same were set forth herein.

112.

The Americans with Disabilities Act prohibits covered entities from "discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

113.

Discrimination based on disability includes an employer's failure to make a "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

114.

As alleged herein, Defendant and Plaintiff are a covered, nonexempt employer and non-exempt employee under the ADA, respectively. See 42 U.S.C. § 12111.

115.

As alleged herein, Plaintiff had been employed with Defendant on multiple occasions and she had been serving as Defendant's Administrative Coordinator for nearly three years at the time of her termination.  Plaintiff had been performing her duties in that role, and was otherwise qualified and able to perform the essential functions of her job, with or without a reasonable accommodation. Moreover, the evidence will reflect that Plaintiff's performance was not only satisfactory, but exemplary.

116.

As alleged herein, Plaintiff has a disability, a history of a disability, and was perceived by

Defendant as having a disability, that substantially limits a number of major life activities.

117.

Specifically, Plaintiff suffers from chronic arthritis, spinal disc herniation or bulging discs in her neck, and lumbar spinal stenosis.  All of these conditions, individually and in the aggregate, substantially limit several major life activities for Plaintiff such as performing manual tasks, sleeping, walking, standing, lifting, bending, and working.

118.

When Plaintiff later requested that Defendant provide a reasonable accommodation in the form of the restrictions recommended by her doctor, said restrictions were based on Plaintiff's medical condition, and not necessary because of any surgery or procedure that Plaintiff had undergone.

119.

Defendant was aware of Plaintiff's disabilities.

120.

On December 2, 2020, Plaintiff requested that Defendant provide her with a reasonable accommodation for her disabilities in the form of not being required to push, pull, or lift items over ten (10) pounds, as recommended by her medical provider.

121.

The reasonable accommodations requested by Plaintiff were available.  Moreover, these accommodations that Plaintiff requested were neither tasks required under Plaintiff's job description, nor were they activities that had previously been required of Plaintiff during her tenure.

122.

Defendant not only failed to provide to provide the requested accommodation, Defendant advised Plaintiff that it did not have any positions available that would allow for the accommodations that Plaintiff requested.

123.

In addition to Defendant's failure to provide a reasonable accommodation, Defendant refused to engage Plaintiff in the interactive process.

124.

Defendant failed and refused to offer or even consider any alternatives to the reasonable accommodations requested by Plaintiff.

125.

At the time that Defendant refused to accommodate Plaintiff, there were open positions for which Plaintiff was qualified and would have been able to perform had such reasonable accommodations been provided.

126.

On December 4, 2020, Defendant terminated Plaintiff's employment instead of providing her with any reasonable accommodation for her disabilities.

127.

Plaintiff has been injured by Defendant's discrimination based on disability due to its failure to provide a reasonable accommodation, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including back pay, reinstatement or front pay, compensatory punitive damages of not less than $300,000.00, or such other amount permitted by statute, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT IV:**
**FAILURE TO PROVIDE A REASONABLE ACCOMMODATION**
**IN VIOLATION OF THE REHABILITATION ACT**

128.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 91, as if the same were set forth herein.

129.

The Rehabilitation Act of 1973 prohibits discrimination based on disability in "any program or activity receiving Federal financial assistance or under any program or activity conducted by an Executive agency…" 29 U.S.C. § 794(a).

130.

Defendant, as a program receiving Federal financial assistance and grants, both directly and indirectly, from the United States government, and Plaintiff, as an employee of Defendant, are a covered entity and individual, respectively, under the Rehabilitation Act.

131.

The Rehabilitation Act expressly incorporates the standards used in Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111, *et seq.* 29 U.S.C. § 794(d).

132.

For the reasons set forth in Count III, *supra*, Defendant discriminated against Plaintiff based on disability due to its failure to provide a reasonable accommodation.

133.

Plaintiff has been injured by Defendant's discrimination due to its failure to provide a reasonable accommodation, and Plaintiff is entitled to all damages available under the Rehabilitation Act, in an amount to be proven at trial.

## COUNT V:
## DISCRIMINATION BASED ON RACE
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

134.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 91, as if the same were set forth herein.

135.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment because of such person's race.  42 U.S.C. § 2000e-2(a).

136.

Plaintiff is considered in a protected class as her race is black or African American.

137.

As alleged herein, Plaintiff was qualified for the position that she held with Defendant and her performance was exemplary at all times.

138.

As alleged herein, Defendant terminated Plaintiff's employment on December 4, 2020.

139.

As alleged herein, Plaintiff was treated less favorably than her coworkers, who were not black or African American, in that Defendant terminated Plaintiff's employment not as the result of any purported misconduct or deficiency in her performance, while Defendant would fail and refuse to terminate or even discipline Plaintiff's similarly situated white co-workers who had indeed engaged in misconduct or had deficiencies in their performance.

140.

Defendant will be unable to present any evidence of a legitimate nondiscriminatory motive for terminating Plaintiff's employment for reasons unrelated to her conduct and performance and otherwise treating Plaintiff less favorably than her counterparts who are not black or African American.

141.

Plaintiff will prove that the Defendant's stated reasons are pretextual and were indeed motivated by Plaintiff's race.

142.

Plaintiff has been injured by Defendant's discrimination based on race against her, and she is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay including fringe benefits, front pay, injunctive relief, compensatory and punitive damages in the amount of not less than $300,000.00, or other amount provided by statute, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT VI:**
**INTERFERENCE WITH RIGHTS**
**UNDER THE FAMILY AND MEDICAL LEAVE ACT**

143.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 91, as if the same were set forth herein.

144.

At all times relevant to this Complaint, Defendant was a covered, non-exempt employer pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, et seq.

145.

As alleged herein, Plaintiff worked for a covered employer, had worked for the covered employer for at least twelve months, had at least 1,250 hours of service for the employer during the twelve-month period immediately preceding the requested leave, and worked at a location where the employer had at least 50 employees within 75 miles.

146.

On or about September 2, 2020, Plaintiff submitted her request for leave under the Family and Medical Leave Act, which she needed as the result of her serious medical conditions, as alleged herein, and because Plaintiff needed to have surgery to address such conditions.

147.

While Defendant granted the request for leave, Defendant frequently required Plaintiff to perform work while she was supposed to be on leave.  For example, continued to have Plaintiff obtain supplies for Defendant's office and operations, deposit checks into Defendant's accounts, and prepare the same kind of reports that Plaintiff had been required to do in her position prior to her leave.

148.

Pursuant to the Family and Medical Leave Act, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise or the attempt to exercise, any right provided under this chapter."  29 U.S.C. § 2615(a)(1).

149.

Defendant engaged in prohibited conduct under the Family and Medical Leave Act by interfering with, restraining, and denying Plaintiff the rights and benefits she was otherwise entitled under the Act.

150.

Moreover, Defendant failed and refused to compensate Plaintiff for any time that she was required to work while she was supposed to be out on FMLA leave.

151.

As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff suffered injuries, including a loss of earnings, mental anguish, physical and emotional distress, humiliation and embarrassment, and the loss of professional reputation.

152.

Pursuant to 29 U.S.C. § 2617(a)(1)(A)(i), Defendant is liable for damages equal to the amount of wages, salary, employment benefits, and other compensation denied or lost to Plaintiff by reason of this violation, in an amount to be proven at trial.

153.

Pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii), due to Defendant's willful violation of the Act and reckless disregard of whether Defendant's conduct was prohibited, Defendant is liable for an additional amount as liquidated damages, equal to the sum of any award of damages under this Count in an amount to be proven at trial.

154.

Pursuant to 29 U.S.C. § 2617(a)(1)(A)(ii), Defendant is liable for interest on any award of damages under this Count in an amount to be proven at trial., calculated at the prevailing rate, and in an amount to be proven at trial.

155.

Pursuant to 29 U.S.C. § 2617(a)(1)(B), Defendant is liable for such equitable relief as may be appropriate, including reinstatement and promotion.

## COUNT VII:
## RETALIATION OR FAILURE TO REINSTATE IN VIOLATION OF
## THE FAMILY AND MEDICAL LEAVE ACT

156.

At all times relevant to this Complaint, Defendant was a covered, non-exempt employer pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq*.

157.

According to the Family and Medical Leave Act, an employee may be entitled to take leave due to certain qualifying events, including in pertinent part, "[b]ecause of a serious health condition that makes the employee unable to perform the functions of her position of such employee." 29 U.S.C. § 2612(a)(1).

158.

As a general rule, once an employee is able to return to work after taking leave under the FMLA, the employee is entitled to be returned to the same position that she held when her leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment. 29 C.F.R. § 825.214.

159.

Further, it is unlawful for any employer to discharge or in any other manner discriminate against any individual because she has exercised her rights under the FMLA. 29 U.S.C. § 2615.

160.

On December 2, 2020, Plaintiff advised Defendant that she would be able to return from FMLA leave on December 8, 2020.

161.

Defendant received Plaintiff's notice that she would be able to return on December 8, 2020.

162.

Instead of allowing Plaintiff to return to the position that she held prior to her leave or an equivalent position thereof, Defendant decided to terminate Plaintiff's employment on December 4, 2020.

163.

In the alternative, Defendant decided to terminate Plaintiff's employment on December 4, 2020, solely because Plaintiff had exercised her right to take leave under the FMLA.

164.

As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff suffered injuries, including a loss of earnings, mental anguish, physical and emotional distress, humiliation and embarrassment, and the loss of professional reputation.

165.

Pursuant to 29 U.S.C. § 2617(a)(1)(A)(i), Defendant is liable for damages equal to the amount of wages, salary, employment benefits, and other compensation denied or lost to Plaintiff by reason of this violation, in an amount to be proven at trial.

166.

Pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii), due to Defendant's willful violation of the Act and reckless disregard of whether Defendant's conduct was prohibited, Defendant is liable for an additional amount as liquidated damages, equal to the sum of any award of damages under this Count in an amount to be proven at trial.

167.

Pursuant to 29 U.S.C. § 2617(a)(1)(A)(ii), Defendant is liable for interest on any award of damages under this Count in an amount to be proven at trial., calculated at the prevailing rate, and

in an amount to be proven at trial.

168.

Pursuant to 29 U.S.C. § 2617(a)(1)(B), Defendant is liable for such equitable relief as may be appropriate, including reinstatement and promotion.

## COUNT VIII:
## FAILURE TO PAY OVERTIME PAY
## IN VIOLATION OF THE FAIR LABOR STANDARDS ACT

169.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 91, as if the same were set forth herein.

170.

Under the Fair Labor Standards Act, an employer must pay a rate of not less than one and one-half times an employee's regular rate for any time worked in excess of forty hours for any given workweek.  *See* 29 U.S.C. § 201(a)(1).

171.

As alleged herein, Defendant and Plaintiff are covered, non-exempt employer and employee under the Fair Labor Standards act, respectively.  *See* 29 U.S.C. § 201(a)(1).

172.

As alleged herein, Plaintiff frequently worked in excess of forty hours per workweek.

173.

Defendant was aware of the fact that Plaintiff worked in excess of forty hours per workweek.

174.

However, Defendant failed to compensate Plaintiff for any hours in excess of forty per workweek at the appropriate overtime rate.

175.

Additionally, Defendant was aware that Plaintiff was performing work that should have been compensated at the rate of overtime but was not because Defendant failed and refused to keep accurate records concerning work performed by Plaintiff outside of normal business hours.

176.

Defendant's conduct, as alleged herein, constitutes failing to provide overtime pay in violation of the Fair Labor Standards Act.

177.

Plaintiff has been injured by Defendant's actions and is entitled to an award of unpaid overtime compensation and all other damages allowed under the Fair Labor Standards Act for the period preceding two years prior to the filing of her initial action civil action, as well as reasonable attorney's fees and costs of litigation to be paid by Defendant pursuant to 29 U.S.C. § 216(b), in an amount to be proven at trial.

178.

The evidence will reflect the fact that Defendant willfully violated the Fair Labor Standards Act when it failed to compensate Plaintiff at the appropriate rate of overtime, and thus, Plaintiff should be permitted to recover all damages listed in the preceding paragraph for the period of three years prior to the filing of this action.

179.

Moreover, Defendant has acted in bad faith and did not have reasonable grounds to believe that its actions were not a violation of the Fair Labor Standards Act.

180.

This Court should exercise its sound discretion to award liquidated damages pursuant to 29 U.S.C. § 260, and should award to Plaintiff said liquidated damages in an amount equal to an award for unpaid overtime compensation.

**COUNT IX:**
**FAILURE TO PAY MINIMUM WAGE**
**IN VIOLATION OF THE FAIR LABOR STANDARDS ACT**

181.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 91, as if the same were set forth herein.

182.

Pursuant to the Fair Labor Standards Act, an employer must pay an employee wages equivalent to $7.25 per hour.  29 U.S.C. § 206.

183.

As alleged herein, Defendant is an "enterprise" under the Fair Labor Standards Act.  *See* 29 U.S.C. § 203(r)(1).

184.

As alleged herein, Plaintiff was a non-exempt covered employee under the Fair Labor Standards Act. 29 U.S.C. § 203(e).

185.

As alleged herein, Plaintiff frequently worked hours for which she did not receive compensation during the period of three years preceding the filing of this action.

186.

As a result, Defendant failed to pay Plaintiff at the rate of minimum wage, or sometimes not at all, during the period of three years preceding the filing of this action.

187.

Defendant's conduct, as alleged herein, constitutes failing to compensate employees at least at the rate of minimum wage in violation of the Fair Labor Standards Act.

188.

Plaintiff has been injured by Defendant's actions and is entitled to an award of compensation at least at a rate of minimum wage and all other damages allowed under the Fair Labor Standards Act, as well as reasonable attorney's fees and costs of litigation to be paid by Defendant pursuant to 29 U.S.C. § 216(b), in an amount to be proven at trial.

189.

Defendant knew the Fair Labor Standards Act's requirements with respect to minimum wage.

190.

Defendant knew that Plaintiff worked certain time in which she was not compensated at all during the period of three years preceding the filing of this action.

191.

Defendant knew that it failed to compensate Plaintiff at least the rate of minimum wage during the period of three years preceding the filing of this action.

192.

Defendant failed to make and keep accurate records of time worked by Plaintiff.

193.

Defendant's refusal to pay at least minimum wage is willful and Defendant has failed to operate in good faith.

194.

This Court should exercise its sound discretion to award liquidated damages pursuant to 29 U.S.C. § 260, and should award to Plaintiff said liquidated damages in an amount equal to any award for compensation less than minimum wage.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dorothy Lloyd respectfully prays for the following relief:

1)      That Summons and Process be issued to Defendant Twin Cedars Youth and Family Services, Inc., and that said Defendant be served as provided by law;

2)      That this matter be tried before a jury;

3)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count I for discrimination based on disability, and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

4)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count II for discrimination based on disability, and grant Plaintiff all relief allowable under the Rehabilitation Act;

5)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count III for discrimination based on disability, by way of Defendant's failure to provide a reasonable accommodation for such disability, and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

6)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count IV for discrimination based on disability, by way of Defendant's failure to provide a reasonable accommodation for such disability, and grant Plaintiff all relief allowable under the Rehabilitation Act;

7)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count V for discrimination based on race, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

8)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count VI for interference with Plaintiff's rights under the Family and Medical Leave Act, and grant Plaintiff all relief allowable under the same;

9)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count VII for failing to reinstate Plaintiff into her position at the conclusion of her leave, or in the alternative, by terminating Plaintiff in retaliation for her taking such leave, and grant Plaintiff all relief allowable under the Family and Medical Leave Act;

10)     That judgment be awarded for and in favor of Plaintiff and against Defendant on Count VIII for failure to compensate Plaintiff at the appropriate rate of overtime, and grant Plaintiff all relief allowable under the Fair Labor Standards Act;

11)     That judgment be awarded for and in favor of Plaintiff and against Defendant on Count IX for failure to compensate Plaintiff at a rate of at least minimum wage, and grant Plaintiff all relief allowable under the Fair Labor Standards Act; and,

12)     For such other relief as this Court shall deem just and proper.

Respectfully submitted, this 26th day of May, 2022.

KENNETH E. BARTON III
Georgia Bar No. 301171
EMILY M. WALKER
Georgia Bar No. 221826
*Attorneys for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com
emw@cooperbarton.com